IRVING, J.,
dissenting.
¶ 8. The majority finds, without expressly saying so, that the chancellor abused his discretion in determining that Gloria had violated a provision in her separation agreement which relieved William of his obligation to pay any monthly alimony installment due to Gloria if:
[Gloria] shall be lawfully married, or carry on a lifestyle with another man so as to afford said man sexual exclusivity and the benefits of marriage without ceremonial endorsement or cohabits with another female under such circumstances so as to afford that female sexual exclusivity and the benefit of a same sex commitment.
(emphasis added). In addition to the above provision, the agreement also contained this provision: ‘Wife shall properly report to Husband all lifestyle changes so as to enable Husband to determine his entitlement to suspension of payments.”
¶ 9. Given the restraints on appellate review of a chancellor’s finding — that is, that the appellate court will not reverse a chancellor unless his findings are clearly erroneous or an abuse of discretion is shown — I believe the majority errs in reversing and rendering the chancellor’s decision. Therefore, I am compelled to dissent, but I do so with deference to the very plausible position embraced by the majority.
¶ 10. In reaching his decision, the chancellor acknowledged the difficulty he faced in attempting to decipher the parties’ intention from the very poorly-drafted separation agreement which encompassed the specific provision in question. As to the *150 provision in dispute, the chancellor observed:
I wish it was more explicit, but it’s not. I’ve got to take what is here and the testimony that came before the Court and try and do what is right and what is lawful in my opinion.
H< H< H< H* H*
What do they mean by the benefits of marriage and the benefits of marriage [sic]? I don’t know. • The main thing that this Court can see is that they— they are trying to limit the wife as to what she can do.
******
Everything in this Paragraph 4(B) refers to her being the exclusive sexual partner of a single man or a single woman and the benefits of marriage. The Court interprets that to be the sexual activities of a couple under the guise of matrimony or marriage.
H: Hi H* H« H« Hi
I think this is what the husband and wife are trying to get at in this separation agreement. I wish it was more clear. I think they are trying to say that once she became sexually active with one man that, that was about the same as marriage. They didn’t put it in those terms but I think that is what they were trying to say.
¶ 11. I am unable to embrace the notion that the chancellor has abused his discretion or that his interpretation of what the parties meant by the provision is clearly erroneous.
¶ 12. Before discussing the evidence, I think it is appropriate to point out that when William and Gloria executed the separation agreement to obtain their irreconcilable differences divorce, they were both represented by attorneys. Therefore, it cannot be legitimately argued that Gloria was overreached, and there is no evidence of fraud in the execution of the agreement. The agreement was approved and made a part of the final judgment when the divorce was granted. Upon this occurrence, the parties were bound by the bargain they had struck.
¶ 13. In Bell v. Bell, 572 So.2d 841 (1990), our supreme court stated the following:
We take it as established that settlement agreements entered into by divorcing spouses and judicially approved under our Irreconcilable Differences Act, Miss. Code Ann. § 93-5-2 (Supp.1990), become a part of the decree and enforceable as such as though entered by the court following contested proceedings. Co-existing with this view is the reality that such agreements are frequently the product of arms length bargaining and thus are in the nature of court-approved contracts.... In property and financial matters between the divorcing spouses themselves, there is no question that, absent fraud or overreaching, the parties should be allowed broad latitude. When the parties have reached agreement and the chancery court has approved it, we ought enforce it and take as dim a view of efforts to modify it, as we ordinarily do when persons seek relief from their improvident contracts.
Id. at 844 (citations omitted).
¶ 14. As the chancellor observed, the agreement was poorly written. The chancellor, however, was obligated to enforce it in accordance with its terms and conditions. In his role as interpreter and enforcer of the agreement, the chancellor concluded that “there has been a change of circumstances under the terms of the agreement [and] that the alimony that William S. Byars, Jr. is required to pay to Gloria Vance Byars is hereby terminated because of the sexual activity as enumerat *151 ed in their final decree for divorce.” I now turn to a discussion of the evidence which the chancellor considered.
¶ 15. Gloria testified that beginning sometime after March 1999, and continuing through the date of the hearing, December 10, 2001, she had had sexual intercourse only with one man. The following colloquy is what the record reflects on this point:
Q. Now, Mr. Ratliff then became divorced in 1999; is that correct?
A. Correct. March of '99.
Q. From Nancy Ratliff?
A. Correct.
Q. And I believe we’ve had a deposition in this, and you said at that time you became — you had a sexual involvement with him; is that correct?
A. After that fact. After that.
Q. March of 1999?
A. Right.
‡ H* H* H* H<
Q. And it’s been on — it’s been an exclusive relationship with him to this date; is that correct?
A. I’ve been seeing him exclusive— well, I’ve — I—I saw one — one guy Pat Tribble one night, I don’t remember the time frame off hand. But as far as the sexual exclusivity it’s been with him since that time, yes.
From Gloria’s own testimony, it is clear that she had carried on a lifestyle with another man so as to afford said man sexual exclusivity. The next question is: what did the parties mean by the phrase, “and the benefits of marriage without ceremonial endorsement”?
¶ 16. The record reflects, without contradiction, that Gloria had been Robert’s constant companion since 1999 and had taken several trips with him, including two trips to Mardi Gras, a trip to Hawaii, a trip to Antigua, a trip to Branson, Missouri, and a trip to Nashville to the National Water Well Association convention. These trips lasted several days, and on each of the trips, Robert and Gloria shared the same bed. Additionally, Gloria testified that she and Robert made numerous trips together to various casinos.
¶ 17. The majority does not clearly identify the benefits of marriage that were not bestowed on Robert Earl by Gloria. Apparently, however, the majority does not consider the constant companionship, provided to Robert Earl by Gloria, a benefit accorded by marriage, or if so, only a singular benefit. Or, perhaps the majority views the fact that Gloria and Robert Earl do not share living quarters together (she lives in Batesville and he in Grenada), irrefutable evidence that Gloria has not provided Robert Earl with the benefits of marriage.
¶ 18. Clearly, there are situations in which unmarried persons live apart but enjoy the benefits of marriage. Therefore, while living together is certainly a benefit of marriage, the failure to live together does not preclude a finding that parties living separate and apart cannot and do not enjoy other benefits of marriage.
¶ 19. The majority observes that Robert Earl does not help Gloria maintain her home or pay her bills. I fail to see the relevance of this fact because the proscription in the separation agreement is against Gloria’s actions, not the actions of the man with whom she may become involved. The majority also notes that Gloria and Robert Earl do not own any assets together and have never commingled any of their finances. While it is true that some married couples buy property together and share a single bank account, I do not find that the failure of these parties to behave *152 accordingly is outcome determinative of whether Gloria’s boyfriend has received some benefits of marriage.
¶ 20. Surely, there are many intangible benefits of marriage, such as emotional bonding, companionship, and mutual counseling, to name a few. I do not believe we should be limited in our view, as to what constitutes the “benefits of marriage.” In this modern culture of changing social norms and mores, couples are increasingly creative in finding ways to reap the benefits of marriage without making the trip to the alter or necessarily physically living with each other. Further, what may be considered a benefit to one couple may not be considered a benefit to another and vice versa, depending on their respective situations, including their professional and financial standing. For example, there are many married women, in control of their own finances, who do not perform the traditional tasks of cooking, washing, ironing, etc. and would consider it an affront to them to suggest that their contribution to the marriage must include these traditional tasks. My point is, while there are things that are traditionally considered benefits of marriage, the benefit list is much more expansive. I believe the majority is too limited in its view in this regard.
¶ 21. I conclude by returning to the chancellor’s view of this matter. As previously observed, his view was that the parties, in the agreement, were focusing on cutting off Gloria’s right to alimony if she entered into a sustained monogamous sexual relationship. While it may be that the provision in question contemplates more than that, I cannot say that his finding in this regard is clearly erroneous. It was his call to make, and we, sitting as a reviewing court, do not have the prerogative to set aside his finding just because we might have decided the issue differently had we been in his place. Richardson v. Riley, 355 So.2d 667, 668 (Miss.1978). And even if the chancellor erred with respect to his conclusion that Gloria’s sexual activity was the triggering mechanism for the interruption of William’s alimony obligations, I believe the record is sufficient to conclude that Gloria has afforded her lover sufficient benefits of marriage to warrant a change in William’s alimony obligations.
¶ 22. I would therefore affirm the chancellor’s finding that there has been a change of circumstances. However, I would reverse and remand for the chancellor to determine to what extent William’s obligation to make alimony payments should be suspended rather than terminated. I believe the provisions quoted at the beginning of this dissent compel this result.
SOUTHWICK, P.J., JOINS THIS SEPARATE OPINION.